# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| ANGE DAVIS, individually and as Administrator of THE ESTATE OF JANIE MAE WASHINGTON, deceased, <br><br> Plaintiffs, <br><br> v. <br><br> GGNSC ADMINISTRATIVE SERVICES LLC d/b/a GOLDEN LIVING CENTER TIFTON, <br><br> Defendants. | Civil Action No. 7:17-CV-107 (HL) |

## ORDER

Before the Court is Defendant's Motion to Dismiss and Compel Arbitration. (Doc. 3). For the reasons discussed below, the motion is denied.

## I. FACTUAL BACKGROUND

On January 5, 2011, Janie Mae Washington was admitted to Golden Living Center in Tifton, Georgia. Golden Living Center is a long-term care skilled nursing facility. Prior to Washington's admittance, her daughter, Plaintiff Ange Davis, met with a staff member of Golden Living Center ("the Facility") on January 4, 2011. On that day, Davis signed an admissions package entitled "Admission and Alternative Dispute Resolution Agreements" that contained two separate agreements. (Doc. 9-1, p. 2). One agreement was a contract for the general terms of admission. The other was an arbitration agreement naming her

mother and the nursing home as parties. Ange Davis signed the agreement on the line designated for the signature of the Resident's Legal Representative. Immediately below Davis's signature is an acknowledgment that states: "By my signature, I represent that I am a person duly authorized by Resident or by law to execute this Agreement and that I accept its terms." (Doc. 3-4, p. 6). The agreement required the signatory to "Specify Capacity of Legal Representative (e.g. Power of Attorney, Agent, Next of Kin)," but Davis left that line blank. Washington was not present when her daughter signed the arbitration agreement or other admissions paperwork, nor was it discussed with her by either her daughter or a representative of the Facility.

On or about February 24, 2011, Ms. Washington executed a general power of attorney appointing Ms. Davis as her attorney-in-fact. Ms. Washington continued to reside at the Facility until December 2015. On January 15, 2016, Ms. Washington passed away.

Davis filed this action in Tift County on April 26, 2017, alleging that the negligence and professional negligence of Defendants "in failing to prevent the injuries that Janie Mae Washington sustained while a resident at the Facility" resulted in her death. (Doc. 9-1, p. 3-4). Defendants removed the complaint to this Court and on June 9, 2017, filed a Motion to Dismiss and Compel Arbitration. (Doc. 3).

## II. ANALYSIS

### A. Enforceability of the Agreement

Defendants allege that the arbitration agreement must be enforced because by signing the document Davis created an enforceable arbitration agreement between her mother and the Facility.

#### i. Applicability of the FAA

Defendants argue that the federal law governing the arbitration agreement mandates the parties submit to arbitration. Specifically, Defendants contend that because the arbitration agreement is part of a contract involving interstate commerce, it must be governed by the Federal Arbitration Act ("FAA").[1] 9 U.S.C. §§ 1-16. Defendants state that under the application of the FAA, its "liberal policy favoring arbitration" requires that the parties submit to arbitration. (Doc. 3-1, p. 5). Additionally, Defendants contend that the FAA supersedes and preempts state law that may require a result contrary to arbitration.

The FAA provides that agreements to arbitrate in contracts involving commerce are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts

---

[1] Defendants explain at length that the arbitration agreement involves interstate commerce. (Doc. 3-1, pp. 9-12). However, it is not in dispute that the agreement involves interstate commerce. See Doc. 3-4, p. 2 ("The parties to this Agreement acknowledge and agree that upon execution by Resident, this Agreement becomes part of the Admissions Agreement, and that the Admission Agreement evidences a transaction in interstate commerce governed by the Federal Arbitration Act.").

3

must conduct a two-step inquiry when deciding whether to compel arbitration. Klay v. All Defendants, 389 F.3d 1191, 1200 (11th Cir. 2004). First, the Court must determine whether the parties agreed to arbitrate the dispute. Id. The Court must make that determination "by applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]." Id. (alteration in original) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)). The United States Court of Appeals for the Eleventh Circuit, however, has cautioned that "arbitration is a matter of contract [and] the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate." Id. Second, the court must determine "whether 'legal constraints external to the parties' agreement foreclosed arbitration." Klay, 389 F.3d at 1200 (quoting Mitsubishi Motors Corp., 473 U.S. at 628).

Defendants are correct in their assertions that the FAA governs the arbitration agreement and that federal law favors the enforceability of arbitration. However, courts only apply the presumption of arbitration "to the interpretation of contracts if we have already determined that, under [s]tate law, the parties formed a valid agreement to arbitrate." Bickerstaff v. SunTrust Bank, 332 Ga. App. 121, 128 (2015). In order "[t]o satisfy itself that such agreement exists," courts must undertake to resolve any issues relating to the formation of the arbitration agreement. Granite Rock Company v. International Brotherhood of Teamsters,

561 U.S. 287, 297 (2010); Larsen v. Citibank FSB, 871 F.3d 1295, 1302–03 (11th Cir. 2017). Thus, even though the FAA applies, the threshold issue is whether, as a matter of contract formation, there was consent by the parties to enter into the agreement. See Hogsett v. Parkwood Nursing & Rehabilitation Center, Inc., 997 F.Supp.2d 1318, 1323 (2014) ("an arbitration agreement is still a contract and, as such, it requires consent by the parties to the agreement").

The Supreme Court has made clear that this inquiry is a matter of state contract law. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). ("[C]ourts generally ... should apply ordinary state-law principles that govern the formation of contracts" in determining whether the parties have agreed to arbitrate.); See also Burch v. P.J. Cheese, Inc., 861 F.3d 1338, 1346 (11th Cir. 2017) (confirming that state contract law governs the question whether an agreement to arbitrate exists); Dasher v. RBC Bank (USA), 745 F.3d 1111, 1116 (11th Cir. 2014) (same).

Defendants, "as the parties seeking arbitration, bear the burden of proving the existence of a valid and enforceable agreement to arbitrate."[2] United Health Services of Georgia v. Alexander, 342 Ga. App. 1, 2 (2017) (citing McKean v.

---

[2] Defendants incorrectly assert that "Plaintiff has the burden of establishing that her claims are not subject to arbitration." (Doc. 3, p. 7). However, as the Eleventh Circuit recently explained in Bazemore v. Jefferson Capital Sys., LLC, 827 F.3d 1325 (11th Cir. 2016), that is not the standard. See id. at 1330, 1334 ("it is defendant's burden under Georgia law to prove the existence and terms of the contract it wishes to enforce.").

5

GGNSC Atlanta, 329 Ga. App. 507, 509 (2014) (internal citations omitted). Therefore, the Court must first determine if the Defendants have met their burden of proving that the arbitration agreement is valid.

    **ii. Agency**

Washington never signed the arbitration agreement, and her daughter's signature on that agreement can only bind Washington and her estate if Davis is deemed to have been an agent of her mother for this purpose. Here, Davis argues that "[b]ecause [she] had no authority to execute the Arbitration Agreement on Janie Mae Washington's behalf, the Plaintiffs have not waived their rights to have the claims set forth in the Complaint for Damages heard by a jury before this Court." (Doc. 9-1, p. 4). In support of this argument, Davis states that at the time she signed the admissions paperwork, she had no legal authority to sign on behalf of her mother for admission into the Facility or otherwise. Further, Davis states that Defendants do not contend that either express or apparent authority existed, and their reliance on her status as Washington's daughter is insufficient evidence of any contractual relationship. Thus, Davis ultimately argues that Defendants have not met their burden in proving "all the essential elements of the contract, including the assent to the contractual terms." See TranSouth Fin. Corp. v. Rooks, 269 Ga. App. 321, 324 (2004) (citation omitted).

Defendants contend, in addition to their argument that the FAA mandates arbitration, that Georgia case law supports a decision in favor of arbitration. Defendants rely on Triad Health Management of Georgia, III, LLC v. Johnson, where, as in this case, a child signed an arbitration agreement on behalf of a parent upon admission to a nursing facility. 298 Ga. App. 204 (2009). However, Triad is readily distinguishable. In Triad, a general power of attorney was in effect at the time the arbitration agreement was signed by the son. Id. at 207 ("[t]he undisputed evidence shows that in effect at the time of Johnson's execution of the Admission Contract was a general power of attorney, executed by Matthew Johnson, designating Johnson as his attorney. . ."). Thus, the court found that the son was his father's express agent and by acting as his fiduciary upon signing the admissions document the parties were bound to the arbitration agreement. Id. at 206-07. Those same facts are not present here.

Washington did not execute a power of attorney until after the signing of the admission documents. Defendants argue that "Ange Davis' Agreement is valid, enforceable and binding since she signed it." (Doc. 3-1, p. 13). Davis' signature alone, however, is not enough to support the contention that she had the authority to create a valid and binding agreement between her mother and the Facility. See McKean, 329 Ga. App. at 510 ("McKean's own action of signing the agreement as his mother's agent is insufficient to create agency.").

1. <u>Express Authority</u>

Under Georgia law, "[t]he relation[ship] of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." O.C.G.A. § 10-6-1. Here, there is no evidence that Washington gave Davis express authority to enter into the arbitration agreement on her behalf either before her admission to the Facility or at the time the admission documents were signed on January 4, 2011. To the contrary, Davis has filed an affidavit stating that Washington was not present at the time she signed the agreement, nor did she inform her mother of the nature of the agreement after it was signed. (Doc. 9-2, pp. 3-4). Thus, no express agency existed.

2. <u>Apparent Authority</u>

In addition to lack of evidence of express authority, there is also no evidence to suggest the existence of implied, or apparent, authority. "[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the *principal* consents to have the act done on his behalf by the person purporting to act for him." <u>McKean</u>, 329 Ga. App. at 510 (quoting <u>Howard v. St. Paul Fire & Marine Ins. Co.</u>, 180 Ga. App. 802, 804 (1986) (emphasis in original)).

Here, Defendants have not presented any evidence of words or conduct of Washington that could have caused the Facility to believe that she consented to having the arbitration agreement signed on her behalf by Davis. "An agency finding cannot be based upon the assumption that an agency relationship exists or upon an inference drawn from the alleged agent's actions." Ashburn Health Care Center, Inc. v. Poole, 286 Ga. App. 24, 26 (2007). Thus, without evidence that Washington consented to Davis acting as her agent in signing the arbitration agreement, no implied authority exists. Further, "the simple fact that [Davis] is [Washington]'s [daughter] is insufficient to establish agency." McKean, 329 Ga. App. at 510.

### 3. Ratification

Finally, in their Reply, Defendants assert that the arbitration agreement is valid as Washington ratified her daughter's actions by executing a general power of attorney seven weeks after admission to the Facility, and by accepting the benefits of the Facility Admission agreement of which the arbitration agreement was a part. As an initial matter, a reply brief is not the appropriate time to present new arguments. See Herring v. Sec'y, Dept. of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court." (internal quotations omitted) (alterations adopted). However, even if the argument was validly raised, it is without merit.

9

In the analogous case of McKean, the appellees raised similar arguments to those of Defendants in the instant case. In McKean, the appellees contend that Patricia, McKean's mother, later ratified her son's actions when she executed a general power of attorney nineteen days after signing an arbitration agreement on her behalf. 329 Ga. App. at 511-12. The Georgia Court of Appeals rejected appellees argument: "the simple fact that Patricia granted McKean power of attorney to act on her behalf did not ratify his earlier action of signing the ADR agreement on her behalf." Id. at 511. In Georgia, "[f]or ratification to be effective, the principal must know of the agent's unauthorized act and, with *full knowledge of all the material facts,* accept and retain the benefits of the unauthorized act." Holy Fellowship Church of God in Christ v. Brittain, 240 Ga. App. 436, 437 (1999) (citation omitted) (emphasis added). Davis admits in her affidavit submitted to the Court that her mother had no knowledge of her signing the arbitration agreement, nor did she have any knowledge regarding of all the material facts surrounding the signing of the arbitration agreement and the consequences that would stem therefrom. Without evidence that Washington had sufficient knowledge, her subsequent decision to grant Davis power of attorney and her receipt of benefits under the agreement as a resident of the Facility do not support a finding of ratification.

**B. Necessity of Arbitrator Involvement**

Defendants also make the argument in their Reply brief that an arbitrator must be involved to make a determination as to any disputes concerning the scope and applicability of the arbitration agreement. In support of their argument, Defendants rely on Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship, 432 F.3d 1327 (11th Cir. 2005). As stated above, this argument is not properly raised. See Herring, 397 F.3d at 1342. Even if the argument were properly raised, however, this Court has previously rejected the very same argument made by the defendants in Stringfield v. GGNSC Tifton, LLC, No. 7:12-CV-18 (HL) (M.D.Ga. Oct. 1, 2012). In Stringfield, a nearly factually identical case to the one at hand, the defendants cited Terminix in support of their position that an arbitrator rather than the court should determine the validity of the arbitration agreement. Id. at 8. This Court found the defendants' reliance on Terminix misplaced: "[t]he primary difference is that Terminix did not involve an unenforceable contract based on lack of agency. Instead, the agreement in Terminix was allegedly unenforceable based on remedial restrictions…. The Terminix parties had authority to bind themselves to arbitration, but here, the Court has determined that Stringfield did not have authority to bind Marsh to arbitration." Stringfield at 8.

Here, as in Stringfield, Defendants' reliance on Terminix is improper as Davis did not have authority to bind Washington to the terms of the agreement.

Thus, Washington is not bound by any of the terms, and it is unnecessary to have an arbitrator determine the validity of the agreement.

### C. Request for Discovery

Finally, Defendants state in their Reply brief that "*at this time*, there is a lack of information regarding the existence of express or apparent agency, as the parties have not conducted any discovery regarding the signing of the ADR Agreement." (Doc. 10, p. 6). As a result, Defendants request that the Court allow "limited discovery related to the signing of the ADR Agreement." (Id.). The Court denies Defendants' request.

### III. CONCLUSION

For the reasons addressed above, Defendants' Motion to Dismiss and Compel Arbitration (Doc. 3) is denied. The stay in this case is hereby lifted. The Court will issue a new Rules 16 and 26 Order.

**SO ORDERED**, this 22nd day of November, 2017.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

ehm